Filed 5/24/23  In re M.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.J. et al.,<br><br>    Defendants and Appellants. | E080117<br><br>(Super. Ct. Nos. J290909, J290910)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven Mapes, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant A.J.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant N.M.

1

Thomas Bunton, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

A.J. (Mother) is the biological mother of 11-year-old S.K.[1] and eight-year-old M.M. N.M. (Father) is the biological father of M.M. and 14-year-old J.M.[2] The parents came to the attention of the San Bernardino County Children and Family Services (CFS) due to severe neglect and physical abuse of the children. The juvenile court bypassed reunification services for the parents, and Mother filed a petition to modify the order pursuant to Welfare and Institutions Code[3] section 388 and Father orally requested modification of the order denying services. The juvenile court denied the parents' requests, found no exceptions to adoption, and terminated parental rights as to S.K. and M.M. On appeal, the parents argue the juvenile court erred in summarily denying their section 388 requests. Mother also argues, with Father joining, that the court erred by not applying the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to adoption. We reject these contentions and affirm the judgment.

---

[1] The whereabouts of S.K.'s biological father are unknown, and he is not a party to this appeal.

[2] J.M.'s biological mother is deceased, and he is not a subject of this appeal.

[3] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Child Welfare History*

The family is known to CFS.  In January 2008, a petition alleging physical abuse was filed on behalf of Father's child S.L.[4]  Father was found to be S.L.'s biological father only and not entitled to reunification services.  In March 2009, CFS received a referral concerning J.M.  At his birth, J.M. was high risk for SIDS and was prescribed a breathing monitor.  However, Father and J.M.'s mother failed to pick up the monitor, despite the fact that J.M.'s biological mother had a previous child who had passed away two months after birth from SIDS.  While on a family maintenance plan, J.M. was taken to the hospital with respiratory distress due to second hand inhalation of his parent's cigarette smoke.  J.M. was removed and placed in foster care.  About a year later, in May 2010, J.M. was returned to his biological mother as Father did not participate in services.  Custody of J.M. was later granted to Father after his biological mother died from an overdose.  Between 2011 and 2019, CFS received numerous referrals with allegations of physical abuse and neglect of J.M. by Mother and Father.  These referrals were closed as unfounded or inconclusive.

B. *Current Dependency*

The family again came to the attention of CFS in September 2021 after it received a referral alleging multiple instances of physical abuse and torture of J.M. by Father and

---

[4] S.L. is not a subject to this appeal.

3

Mother. Father reportedly hit J.M. with a paddle "so hard on his 'behind' that he could not sit down." Father had also placed a shock collar on J.M. and threatened to shock J.M. if he did not clean around the home. Father shocked J.M. with the collar even if J.M. cleaned up. It was also reported that J.M. often slept in a tent outside, and one morning Father lit fireworks near the tent, causing J.M. to be frightened. In addition, while J.M. was playing outside, Father abruptly "smacked" him.

The social worker made an unannounced visit to the parents' home on September 17, 2021. The family, however, was not home and the social worker left a note on the door for the parents. Father called later that day, reporting he was leaving town and would contact the social worker upon his return. After no return contact was received from Father, the social worker returned to the home unannounced on October 8, 2021. Mother was present and alerted Father of the social worker's arrival.

J.M. was found dirty in the front yard with "numerous tiny bites on his thighs," which J.M. reported were from bed bugs in the home. He appeared extremely uncomfortable talking to the social worker and denied being physically abused without being prompted. He also denied having the shock collar on him when the social worker asked if Father had one for the dogs. J.M. constantly looked to see if Father and Mother were listening. The social worker eventually terminated the interview. S.K. was also found dirty in the front yard. He denied any physical abuse or seeing a shock caller in the home. S.K. reported that J.M. was always in trouble but did not provide details. He appeared coached and also looked to see if anyone was listening. M.M. was also found

4

to be filthy with matted hair and refused to speak with the social worker. The social worker noted that there were 12 dogs, three cats, a bird, and rabbits inside the home with a foul odor throughout the home and numerous roaches.

Father reported that he was in the process of cleaning and fixing up the home but had been out of town the previous two weeks. He admitted to having a shock collar, but denied ever using it on any of the children. Father also denied forcing J.M. to sleep outside in the tent, but admitted to lighting firecrackers next to the tent while J.M. was sleeping inside as a joke. Father admitted to hitting J.M. with a paddle with holes drilled in it. Mother admitted to having a shock collar and smoking marijuana outside the home to deal with her anxiety and depression, but denied any physical discipline in the home. She also denied that J.M. had ever been hit with a paddle and noted J.M.'s behavior and ADHD.

As the social worker was leaving, the children's older half-sibling S.L. tossed a handwritten note into the social worker's car and mouthed "'please help them.'" The note indicated that Father and Mother beat the children, especially J.M., that they used shock collars on J.M. multiple times, and that Mother threatened to snap J.M.'s neck. The note further stated that Mother attacked S.L. and threatened to go on a killing spree if the children were taken away.

When S.L. was interviewed on October 12, 2021, she reported witnessing J.M. being physically abused by Mother. She also noted three occasions when Father shocked J.M. with a shock collar. Further, she reported that Father and Mother laugh when

5

shocking J.M. S.L.'s statements were confirmed by the original reporting party, who indicated that J.M. was forced to sleep outside in a tent as a form of punishment, and that Father laughed as he lit firecrackers both inside and outside the tent while J.M. slept in it. The reporting party also witnessed Father put a shock collar on J.M. on three separate occasions, which caused J.M. to scream and cry while Father and Mother laughed. Father also shot J.M. with a "BB gun" in the shoulder and chest and hit J.M. with a paddle. The reporting party noted other instances in which J.M. was treated horribly by Mother and Father.

The social worker also interview J.M. on October 12, 2021. He apologized for lying to the social worker when he was previously interviewed, and stated he had been shocked with a shock collar at least four times. He was told not to report these allegations because Father could go to jail and believed that Mother hated him because she punched him in the head and pulled his hair. He reported that for two months he was only fed "'beans, lentils and rice for breakfast, lunch and dinner'" and forced to do chores every day after school and was never allowed to play. Later that day, the social worker and law enforcement made an unannounced visit to the home. Father admitted to shocking J.M. with a shock collar once. The children were taken into protective custody, and Father and Mother were arrested and charged with child endangerment. While being booked into jail, Father remarked that J.M. deserved to be in jail rather than him.

On October 14, 2021, petitions were filed on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling).

The children were formally detained from parental custody at the October 15, 2021 detention hearing. The parents were present and placed on notice that the children's counsel may seek to bypass reunification services. The parents were offered pre-dispositional services. Mother was provided with strict supervised visits with her children S.K. and M.M., and Father was denied visitation unless in a therapeutic setting.

When the parents were reinterviewed on October 21, 2021, Father denied the physical abuse allegations. He explained that J.M. had placed the shock collar on himself on one occasion and minimized the effects of being shocked by the collar. He appeared to blame J.M. and claimed that the only person who was in need of services was J.M. He stated that J.M. had ADHD and had previously been accused of sexually touching M.M. Mother appeared anxious, and needed to leave the room multiple times during the interview. She reported that she was agoraphobic and suffered from depression. She denied that her mental health affected her ability to care for the children, but admitted that she received social security disability income due to her diagnosis. Mother dismissed all of the physical abuse allegations as lies stemming from S.L.

When interviewed by the social worker on October 20, 2021, M.M. admitted witnessing Father shock J.M. with the dog collar on three occasions. She described

7

Father pressing the button on the remote and J.M. crying.  M.M. requested that the social worker not take notes as Father told her not to say anything.  She denied that the shock collar had ever been put on her or S.K.  J.M. noted that he had placed the shock collar on his leg once and that Father had placed the collar on him five or six times.  He thought Father hated him because he would continue "to turn the shock collar even though he was crying."  J.M. stated that Mother physically abused him by hitting him all over the torso.  He repeated that he was forced to sleep in a tent outside and only allowed to eat beans, rice and lentils.

CFS concluded the risk of abuse and neglect of the children was high based on the parents' abuse of J.M. and that the parents had not addressed or mitigated the issues which led to the children's removal.  The parents had not taken responsibility for their actions, blamed J.M. for the intervention, and did not appear to be remorseful.  The social worker opined Father was using the shock collar on J.M. as a means to torture him.  CFS recommended that the children be removed from parental custody and that reunification services be denied to the parents.

The parents continued to deny the allegations, stating they were "'all lies.'"  Father claimed J.M. "'lies and makes up stories,'" while Mother stated S.L. lied and "'got away with it.'"  The parents were, however, participating in individual counseling, anger management, and parenting classes.

J.M. and M.M. underwent a forensic interview on November 21, 2021.  At that time, J.M. recanted or minimized the parents' actions.  He reported that Father only put a

shock collar on him once, and that he had only been shocked by request or accidentally. He noted that Mother pulled him by his ear and hair "all the time" and that Mother had left a cut on his ear and pulled out some of his hair. He further reported instances where the children were forced to press a penny to the wall with their forehead, nose or inner arm while holding up milk jugs filled with water. It was later reported that on or around November 18, 2021, a few days before the forensic interview, Father had unauthorized communications with J.M. via his Xbox.

M.M. appeared anxious and requested to leave. She reported that Mother told her not to speak with authorities and if she did, she would not be able to go to visits. She, however, alluded to her and siblings being forced to stand against the wall with their arms above her head, noting "'[i]t hurt.'" She also mentioned "getting 'spankings on the butt'" but did not elaborate. M.M. had bruising on her chest, back and buttocks. The forensic interviewer concluded that the parents' conduct was concerning for torture based on the forensic interviews, the medical exams and the disclosures of repeated physical and psychological abuse.

M.M. and S.K. were placed with their maternal uncle and aunt on January 28, 2022 and were doing well in the home. The parents had completed their initial referral for counseling services and indicated that they did not need additional therapy services. When the social worker inquired them whether they had discussed the reasons that led to the children's removal from their home, the parents maintained that allegations were untrue and that CFS "'wants us to admit to a lie.'" They also stated that the therapist did

9

not have a copy of CFS's reports so they were unable to address the concerns. The provider confirmed the therapist did have a copy of the jurisdiction/disposition report. On February 17, 2022, the parents requested additional therapy sessions and a re-referral was submitted.

The contested jurisdiction/disposition hearing was held on April 5, 2022. No additional evidence was presented by the parties, but the parents objected to the allegations in the petitions. The juvenile court found true the allegations in the petitions and dismissed all of the section 300, subdivision (g) allegations, except as to Father and J.M. The court determined that the parents had inflicted severe physical and emotional harm which was "clear torture" and that "[M]other was, basically, consenting by, at very least, implication to the torture of [J.M.]." The court declared the children dependents of the court and bypassed reunification services for both parents under section 361.5, subdivision (b)(6). The court found the parents had not proven by clear and convincing evidence that services were in the children's best interests because of the parents' repeated denials of the allegations and coaching of the children. The court provided Mother with visitation with her children, but denied Father visitation as detrimental to the children, and set a section 366.26 hearing.

By August 2022 366.26, the parents had not completed their case plan and continued to be in denial about the children's removal. Father was reportedly in and out of jail, and had attempted suicide because of the jail time he faced for criminal charges. Meanwhile, M.M. and S.K.'s aunt and uncle desired to adopt them, and the children were

10

happy to be adopted by them. The caregivers' reported that visits with Mother had been inconsistent, at "once or twice a month." The caregivers were committed to providing M.M. and S.K. with stability and permanency. They had noted that M.M. was making positive progress in addressing her behavioral issues. There were no behavioral concerns as to S.K., and both M.M. and S.K. were doing well in school.

On October 27, 2022, Mother filed a section 388 petition, seeking reversal of the orders denying reunification services and setting a 366.26 hearing as to M.M. and S.K. As to a change of circumstances, Mother alleged that she had classes and counseling, visited M.M. and S.K., and improved the condition of her home. As to the best interest of the children, Mother alleged that she had addressed the issues which led to the children's removal, consistently visited the children, and that it would be in their best interest to reunify. She included a note which stated the parents had completed approximately 36 to 37 weeks of classes, and provided certificates of completion for 12-week parenting and anger management classes dated February 15, 2022.

The contested section 366.26 hearing was held on November 2, 2022. At that time, Father's counsel noted that they were in the process of filing a section 388 petition and made an oral motion to change the order denying Father services. Counsel also requested a continuance to file a section 388 petition. The juvenile court found that Mother's petition did not present a change in circumstances, noting the classes had been completed prior to jurisdiction and no supporting documents had been filed, and that granting the petition was not in the children's best interests. The court thus denied

11

Mother's section 388 petition. The court also denied Father's oral motion under section 388, finding Father's request to continue the matter to file a section 388 petition was not in the children's best interests, considering Father had three months between the jurisdiction/disposition hearing and the section 366.26 hearing to file such a petition. The court found Father's request to be untimely. The court denied Father's request for a bonding study on the same ground. Following arguments, the juvenile court found M.M. and S.K. adoptable and terminated parental rights. The court found that Mother had established a relationship with M.M. and S.K. and that she had consistently visited the children, but that M.M. and S.K. would not suffer a detriment by severing their relationship with Mother.

On November 2, 2022, Mother filed a notice of appeal, stating she was appealing the juvenile court's order terminating parental rights. The notice did not indicate that she was appealing the denial of her section 388 petition. Father filed his notice of appeal on November 8, 2022, indicating he was appealing from the termination of parental rights and left the section for appealing a section 388 order blank.

III.

DISCUSSION

A. *Denial of Section 388 Petitions*

The parents argue the juvenile court abused its discretion when it summarily denied their section 388 petitions because they had shown a prima facie case for changed circumstances and best interest of the children. CFS initially responds that the parents

are estopped from raising this issue as their notices of appeal were deficient.  In other words, CFS asserts we lack jurisdiction to consider this issue because the notices of appeal filed in the juvenile court did not sufficiently identify the order denying their section 388 petition, and thus based on the notices of appeal, the parents appealed only the order terminating their parental rights.  Alternatively, CFS contends the juvenile court properly denied the section 388 petitions without an evidentiary hearing.

### 1.  Jurisdiction

"'[A]n appealable judgment or order is a jurisdictional prerequisite to an appeal.'" (*Hedwall v. PCMV, LLC* (2018) 22 Cal.App.5th 564, 571.)  The notice of appeal sets forth the scope of our review and must identify the judgment or order being appealed. (Cal. Rules of Court, rule 8.405(a)(3); *Faunce v. Cate* (2013) 222 Cal.App.4th 166, 170.) However, we generally must construe notices of appeal liberally "'to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.'"  (*Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1249; see Cal. Rules of Court, rule 8.405(a)(3).)

Applying a liberal construction to the notice of appeal in the present case, we conclude it is reasonably clear the notices of appeal encompass the orders denying the parents' section 388 petition.  (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450-1451 [construing notice of appeal referencing parental rights termination order to include order denying section 388 petition]; *In re Angelina E.* (2015) 233 Cal.App.4th 583, 585, fn. 2 [same].)  The court issued both the orders terminating the parents' parental rights

13

and the orders denying the section 388 petitions on the same date, which the parents expressly identified in their notice of appeal.  (*In re Daniel Z.* (1992) 10 Cal.App.4th 1009, 1017 ["Liberal construction is particularly appropriate here because the jurisdictional finding and dispositional order were rendered simultaneously on January 9, 1992—the date specified in the notice of appeal . . . ."].)  Further, the parents filed the notice of appeal in a timely manner.  Mother filed her notice of appeal on the same day and Father six days after the court issued the order denying their section 388 petitions and well within the 60-day deadline to appeal.  (Cal. Rules of Court, rule 8.406(a)(1).)

In support of its argument that we lack jurisdiction to consider the juvenile court's ruling on the section 388 petition, CFS relies on our case *In re J.F.* (2019) 39 Cal.App.5th 70 (*J.F.*).  In *J.F.*, the juvenile court denied a parent's section 388 petition and, 44 days later, terminated the parent's rights as to the child.  (*Id.* at p. 73.)  The parent filed a notice of appeal specifying only the date and description of the parental rights termination order—not the date or a description of the order denying the section 388 petition issued a month and a half earlier.  (*Ibid.*)  A panel of this court concluded it lacked jurisdiction to assess the section 388 order because it "was entered many days before the juvenile court terminated parental rights, and the notice of appeal from the termination order did not mention whatsoever the earlier order or the date it was entered . . . ."  (*J.F.*, *supra*, at p. 78.)

The *J.F.* decision is distinguishable from the present case.  Unlike the juvenile court orders at issue in *J.F.*, the section 388 orders and the parental rights termination

orders in this case were both issued by the juvenile court on the same date at the same hearing on November 2, 2022. Further, unlike the parent in *J.F.*, the parents expressly specified the date of the order denying the section 388 petition in their notice of appeal, which Mother filed on the same and Father filed just six days after the court issued the orders. Given these facts, we believe it is reasonably clear Mother and Father's notice of appeal in the present case, when subject to a liberal construction, encompasses the order denying their section 388 petitions. Further, CFS does not contend it has suffered or will suffer prejudice based on a liberal construction of the notices of appeal that encompass the juvenile court's orders denying the section 388 petitions.

For all these reasons, we conclude we have jurisdiction to consider the challenge to the juvenile court's section 388 orders. (See *In re Madison W.*, *supra*, 141 Cal.App.4th at pp. 1450-1451; *In re Angelina E.*, *supra*, 233 Cal.App.4th at p. 585, fn. 2.) Therefore, we now proceed to the merits of the parents' appeal.

2. *Section 388*

Under section 388, a juvenile court order may be changed or set aside "if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) Section 388 thus acts as an "'escape mechanism'" for a parent facing termination of his or her parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated or bypassed. (*In*

15

*re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*) "[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.*, *supra*, at p. 806; § 388, subd. (d) ["If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . ."].) If, for instance, the parent makes a prima facie showing of changed circumstances, the juvenile court can still deny the petition without an evidentiary hearing if the parent fails to make a prima facie showing the relief sought would promote the child's best interest. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-190.)

"'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.'" (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 418.) Consequently, section 388 petitions with general, conclusory allegations do not suffice. Otherwise, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.) The juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change

16

of circumstance, and the reason the change was not made sooner." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616; see *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Moreover, once reunification services are ordered terminated or bypassed, the focus shifts from reunification to the child's need for permanency and stability, and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 309-310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526-527.)

We review the juvenile court's order on a section 388 petition for abuse of discretion. (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) The juvenile court's decision will not be disturbed unless the court "'"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination . . . ."'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion . . . ." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.)

17

The parents contend the juvenile court should have held a hearing on their section 388 petitions because they established a prima facie showing of changed circumstances and that the proposed change would promote the best interest of the children. On the record before us, we conclude the juvenile court did not abuse its discretion in finding that Mother and Father failed to make the prima facie showing necessary to warrant an evidentiary hearing. Assuming, without deciding, the parents engagement in services constituted changed circumstances, the juvenile court was well within its discretion in finding M.M. and S.K.'s best interests would not be served by the requested modification.

Mother filed her section 388 petition on October 27, 2022, six days before the section 366.26 hearing. And Father made his oral motion under section 388 the same day as the section 366.26 hearing. Parent and child share a fundamental interest in reuniting up to the point at which reunification efforts cease. (*In re R.H.* (2009) 170 Cal.App.4th 678, 697, disapproved on another ground in *John v. Superior Court* (2016) 63 Cal.4th 91, 98-100.) By the point of a section 366.26 hearing to select and implement a child's permanent plan, however, the interests of the parent and the child have diverged. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) Therefore, as previously noted, after reunification efforts have terminated or bypassed, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309; *Stephanie M.*, *supra*, 7 Cal.4th at pp. 317-318.) This is a difficult burden to meet when reunification services have been

18

bypassed or terminated. This is because, "[a]fter the termination of reunification services [or bypass of services], a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464 (*Angel B.*).) In fact, there is a rebuttable presumption continued foster care is in the child's best interest. (*Ibid.*) Such presumption applies with even greater strength when adoption is the permanent plan. (*Ibid.*) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, *supra*, at p. 317.)

The parents ignore this shift in focus. In her petition, Mother alleged it would be in M.M. and S.K.'s best interest to reunify with her because she addressed the issues that led to removal and continued to maintain a parental relationship by visiting them. In her briefs, Mother points out that she immediately engaged in pre-dispositional services, she had a positive relationship with M.M. and S.K., and both children indicated their desire to be with her. Father asserts that it is in M.M.'s best interest for the court to provide him with reunification services because M.M. wants to visit with Father.

However, in light of the court's focus on permanence and stability and not reunification, the parents assertions that it is in the children's best interest to offer them reunification services is conclusory. Given the late stage of the dependency proceedings, the children's "interest in stability was the court's foremost concern and outweighed any interest in reunification." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) The

19

parents do not include any facts which would support a finding that the children would be better off with them than continuing in their current placement. In other words, the parents did not attempt to rebut the presumption that continued out-of-home placement was in the best interest of the children. (See *Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) Neither in the juvenile court nor on appeal has Mother or Father addressed the children's need for permanency and stability and how those interests would be advanced by offering them services. "The presumption favoring natural parents by itself does not satisfy the best interests prong of section 388." (*In re Justice P.*, *supra*, 123 Cal.App.4th at p. 192.)

At the time Mother filed her section 388 petition, shortly before the section 366.26 hearing, and at the time Father made his oral section 388 request, the children's interest in stability was the juvenile court's foremost concern, outweighing any interest in reunification. The prospect of allowing the parents reunification services to see if they would and could do what they were required to do to regain custody would not have promoted stability for the children, and thus would not have promoted the children's best interest. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.) S.K. and M.M. were thriving in the home of their maternal uncle and aunt who wished to adopt them and provide them with stability, security and permanency. They were placed in their prospective adoptive home with their maternal uncle and aunt in January 2022, and have been in that home for over a year. Granting reunification services to the parents would only prolong the children's adoption into a stable and loving home. The social worker noted that the children were doing well in their prospective adoptive home and that the maternal uncle and aunt were

20

meeting the children's developmental, emotional and educational needs. In fact, due to the stability and love provided by the maternal uncle and aunt, M.M.'s behavior was improving and both S.K. and M.M. were doing excellent in school.

On the other hand, Mother and Father continued to deny the allegations, claiming they were lies perpetuated by J.M. or S.L. and attempting to coach the children. The juvenile court could reasonably conclude that, under such circumstances and in light of the parents' history with CFS, the parents had not made a prima facie showing of changed circumstances or that reinstating reunification services would have promoted stability for the children and be in their best interest. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.)

In *Angel B.*, *supra*, 97 Cal.App.4th 454, the court rejected the mother's contention the juvenile court erred in denying her section 388 petition without holding a hearing. The mother in *Angel B.* had a long history of drug abuse, unsuccessful rehabilitation attempts, and failure to reunify with another child. After the mother was denied reunification services, she began to improve, enrolling in a treatment program, testing clean for four months, completing various classes, and obtaining employment. Regular visits with her child also went well. (*Id*. at p. 459.) Nevertheless, when she filed her section 388 petition for reunification services, the court summarily denied her petition without a hearing. The Court of Appeal affirmed, finding no abuse of discretion in the juvenile court refusing to hold a hearing. (*Id*. at p. 462.)

21

The appellate court in *Angel B*. acknowledged the petition showed the mother was doing well, "in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with [the child]." (*Angel B*., *supra*, 97 Cal.App.4th at pp. 464-465.) The court also assumed for purposes of the appeal "that this time her resolve is different, and that she will, in fact, be able to remain sober, remain employed, become self-supporting and obtain housing." (*Id*. at p. 465, italics omitted.) Nevertheless, the court concluded "such facts are not legally sufficient to require a hearing on her section 388 petition." (*Ibid*.) The court explained: "[T]here is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. [Citation.] To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*Ibid*.) The mother in *Angel B*. did not make such a showing. Nor do Mother and Father here.

We conclude Mother and Father have not made a prima facie showing that the children's best interest would be served by offering them reunification services. The juvenile court therefore did not abuse its discretion in summarily denying Mother's section 388 petition and Father's oral motion under section 388 without a hearing.

B. *Parental Benefit Relationship Exception*

Mother also contends, with Father joining in her argument, that the juvenile court erred in finding the parental benefit exception to adoption did not apply and thereby erred

in terminating her parental rights. We find the court did not err in concluding that Mother had not established the necessary exception.

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed" (*In re J.D.* (2021) 70 Cal.App.5th 833, 851-852) and "to provide stable, permanent homes" for dependent children (§ 366.26, subd. (b)). At this hearing "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.] Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"].)

One of the exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) "regular visitation and contact with the child"; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) "terminating that attachment would be detrimental to the child even when balanced

against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the "'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Here, the juvenile court found that Mother had consistently visited M.M. and S.K.

The second element focuses on the child and is determined by taking into consideration factors such as "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Id.* at p. 633.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative. (*Id.* at p. 637.) Nonetheless, a

parent's inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a '"negative effect"' on the child." (*Ibid.*) Performing this analysis is a "subtle enterprise." (*Id*. at p. 634.) And "[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid.*)

There is "no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) To the contrary, the juvenile court is only required to "'state its reasons in writing or on the record'" when it makes a finding under section 366.26 subdivision (c)(1)(D) that "termination of parental rights *would be* detrimental to the child." (§ 366.26, subd. (c)(1)(D), italics added; *In re A.L.*, *supra*, at p. 1156.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) As a reviewing court, we do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts'" and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id*. at p. 640.) "We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its

ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.)

Here, the juvenile court found Mother failed to carry her burden in establishing the parental-benefit exception to adoption. The court explained, "considering the *Caden C.* factors, the children will not suffer detriment or great harm by severing the parent-child relationship. And I don't find that continuation of the parent-child relationship would benefit the children despite the regular visitation and contact." Substantial evidence supports this determination, and we conclude the court did not abuse its discretion in terminating Mother and Father's parental rights.

Assuming Mother had met the second element that M.M. and S.K. have a substantial, positive, emotional attachment to her, the parental-benefit exception does not apply unless Mother also demonstrates by a preponderance of the evidence that terminating that attachment would be detrimental to them. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Again, even if we presume for purposes of the analysis that the children have a significant relationship with their mother, her inability to satisfy the third element is fatal to her claim.

In assessing whether terminating the parental relationship would be detrimental to the child, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in

26

effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.)

Mother presented very little evidence at the contested hearing that terminating M.M. and S.K.'s relationship with her would be detrimental to them. Mother argues that she had built a bond with M.M. and S.K. and they expressed a willingness to live with her. However, these are factors in determining the second element, not whether terminating the children's attachment to their mother would be detrimental to them. (*Caden C*., *supra*, 11 Cal.5th at p. 636.) Mother offered no evidence under which the juvenile court could conclude that the children's loss of their relationship with Mother would outweigh the benefit of stability in a new adoptive home. Her appellate briefing likewise fails to provide a compelling reason why the children should not remain with the prospective adoptive parents, who had provided them with affection, stability, services, and predictability. While the children liked to visit Mother and M.M. stated it would be a "good plan" to be with her mother, Mother's relationship with M.M. and S.K. did not outweigh the benefits of adoption. The children did not show any signs of distress when visitation with Mother was over, they did not ask for Mother during her absence, M.M.'s behavior improved while in the care of her prospective adoptive parents, and the children were happy in their home. In other words, evidence supported the inference that this was not a situation where "the relationship with [the] parent [was] so important to the child that the security and stability of a new home wouldn't outweigh its loss." (*Caden C*., *supra*, 11 Cal.5th at p. 633.)

As our Supreme Court in *Caden C.* noted, when considering how a child might be affected by losing a parental relationship, the court may consider whether severing the relationship results in the child suffering such issues as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In this case, evidence from the caregivers, social workers, and therapists, indicated that the opposite was true. Thus, substantial evidence supported the conclusion that the stability of an adoptive home outweighed any harm from severing the relationship. Viewing the evidence in the light most favorable to the juvenile court's order, as we must, we conclude the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption and terminated parental rights. (*Id.* at p. 641.)

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

28